**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**KIMBERLY NEAL BEPPLE** and **BRIDGETTE LEWIS**, individually and behalf of a class of others similarly situated,

Plaintiffs,

v.

**DR. STEVE SHELTON**, **DR. ELIZABETH SAZIE**, **DR. ROBERT SNIDER**, **DARREN ULFORD**, **ALANA BRUNS**, **R.N. HAN VU**, **M.A. JAMES COULTER**, **RAYMOND HETLAGE**, **HEIDI STEWARD**, **LLOYD SHIMABUKU**, **WILLIAM HOEFEL**, **HEATHER VILLANUEVA**, **DAVID BROWN**, and **DEB ROBERTSON**,

Defendants.

Case No. 3:15-cv-00727-SI

**OPINION AND ORDER**

Leonard Randolph Berman, LAW OFFICE OF LEONARD R. BERMAN, 4711 SW Huber Street, Suite E-3, Portland, OR 97219. Of Attorneys for Plaintiffs.

Ellen F. Rosenblum, Attorney General, Michael R. Washington, Senior Assistant Attorney General, Jessica B. Spooner, Assistant Attorney General, Oregon Department of Justice, Trial Division, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiffs Kimberly Neal Bepple ("Bepple") and Bridgette Lewis ("Lewis") (collectively "Plaintiffs") bring this lawsuit on behalf of themselves and a putative class of similarly-situated female inmates against Defendants, care providers and employees at the Coffee Creek Correctional Facility ("CCCF"). Plaintiffs allege five claims: (1) a claim under 42 U.S.C. § 1983 alleging that Defendants Dr. Steve Shelton ("Dr. Shelton"), Dr. Elizabeth Sazie ("Dr. Sazie"), and Dr. Robert Snider ("Dr. Snider") violated Plaintiffs' rights under the Eighth Amendment; (2) a state law claim for medical negligence against Defendants Dr. Shelton, Dr. Sazie, Dr. Snider, James Coulter ("Coulter"), and Han Vu ("Vu"); (3) a state law claim for sexual battery against Dr. Snider; (4) a claim under 42 U.S.C. § 1985(2) against all Defendants for conspiring to violate Plaintiffs' First and Eighth Amendment rights by hindering the prosecution of Dr. Snider and obstructing justice because of Plaintiffs' gender; and (5) a claim under 42 U.S.C. § 1985(3) against all Defendants for conspiring to deprive Plaintiffs of their First and Eighth Amendment rights because of Plaintiffs' gender.

Defendants move for summary judgment against some but not all of Plaintiffs' claims. Specifically, Defendants move against all of Lewis's claims, all claims against Defendants in their official capacities, Bepple's 42 U.S.C. § 1985 claims, and Bepple's 42 U.S.C. § 1983 claims against Dr. Shelton and Dr. Sazie. For the reasons below, the Court grants Defendants' motion in part and denies it in part.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

**BACKGROUND**

The following facts are supported by the record and presented in the light most favorable to Plaintiffs, the non-moving party. Bepple and Lewis were admitted to CCCF on April 24, 2013. On May 1, 2013, Dr. Snider performed gynecological exams on both Bepple and Lewis at CCCF. That facility requires gynecological exams for all female inmates. Bepple and Lewis had undergone routine exams in the past, both in and out of custody, without incident. Dr. Snider's examinations, however, deviated from what Bepple and Lewis had previously experienced. Coulter, a medical assistant, attended Bepple's exam, and Vu, a registered nurse, attended Lewis's exam, but during Dr. Snider's examinations, a curtain was drawn, shielding each patient from view of the attending assistant or nurse. Dr. Snider inserted a speculum into Bepple's vagina and manipulated it "in a non-therapeutic and highly irregular and offensive manner." Dkt. 1 ¶ 8. Dr. Snider repeated this conduct during Lewis's exam and also "manipulate[d] the outer and upper labia of Lewis's vagina repeatedly in a non-therapeutic and highly irregular and offensive manner." *Id.* ¶ 9. Dr. Snider told both Bepple and Lewis that their cervixes were playing "hide and seek." *Id.* ¶¶ 19, 21-22. After the exams, both Bepple and Lewis called their friends and family and stated that Dr. Snider had "sexually assaulted" them. Dkt. 8 at 7.

On the day of their exams, Bepple and Lewis notified Defendant Captain Raymond Hetlage ("Hetlage") of the incident. Hetlage notified Defendant Captain Alana Bruns ("Bruns"), and Bruns interviewed Bepple and Lewis on or about May 2, 2013. Bruns completed an Investigative Referral Sheet and sent it to the Special Investigation Unit ("SIU") of the Oregon Department of Corrections ("ODOC"). SIU began an investigation, led by Defendant Darrel Ufford ("Ufford"), on May 6, 2013. Also on May 6, 2013, the ODOC notified the Oregon State Police of the investigation. Additionally, Defendant David Brown ("Brown"), the Medical Services Manager, was made aware of the complaints about Dr. Snider. *See* Dkt. 21 at 8. Ufford interviewed Bepple, Lewis, Vu, Coulter, Dr. Snider, and another inmate named Katie Wilkinson, who had talked to Bepple and Lewis about Dr. Snider.

The investigation revealed that Bepple communicated her discomfort during the examination, and Coulter overheard. Coulter believed that Bepple's discomfort was due to the fact that both the physician and the attendant were male. Bepple told Ufford that she complained during the exam and "began to cry without tears." *Id.* at 9. When Dr. Snider talked to Ufford, Dr. Snider stated that Bepple had given birth in October 2012 and that her excessive weight and "redundant vaginal tissue" necessitated an unusual amount of speculum use. *Id.* at 8. Dr. Snider did not offer an explanation for why Lewis's examination may have required any unusual methods.

Vu remembered Lewis being "nice and understanding about the whole process," seeming "chatty," and "giggling" during the exam. *Id.* at 7, 11. Lewis, however, reported "spotting" after her exam. Dkt. 8 at 9. Ufford noted that "spotting" may be normal following a gynecological exam. *Id.* Lewis also told Ufford that during the digital portion of Dr. Snider's exam, she believed Dr. Snider inappropriately used his fingers. Lewis had described to Bruns what Lewis

believed to be inappropriate rubbing by Dr. Snider. Both Bepple and Lewis told Ufford about the "hide and seek" comments.

Ufford completed the investigation on June 12, 2013, finding "no evidence to support the allegations" made by Bepple and Lewis. *Id.* at 6. He found it suspicious that Lewis and Bepple's complaints "were nearly word for word identical." *Id.* at 8. On June 24, 2013, Defendant William Hoefel ("Hoefel") sent a memo describing the results of the investigation to Dr. Snider, Dr. Shelton, Brown, Defendant Heidi Steward ("Steward"), Defendant Heather Villanueva ("Villanueva"), and Defendant Deb Robertson ("Robertson").[1] The memo stated that Hoefel had received a complaint that Dr. Snider "used inappropriate procedures" but that "there was no evidence to support the allegations." Dkt. 23-3 at 13. On June 25, 2013, Robertson sent a copy of Ufford's full report to Dr. Shelton, Steward, Villanueva, Brown, and Hoefel. On July 10, 2013, Defendant Lloyd Shimabuku, Inspections Administrator for SIU, also sent a copy of the investigative report to Steward and requested that Steward advise Executive Support of what discipline, if any, the ODOC would impose on Dr. Snider. No one referred the case to the Oregon State Police or any other outside county or federal agency for further action, and no discipline was imposed on Dr. Snider. Dr. Snider continued to work at CCCF.

CCCF has grievance procedures in place for inmates to make reports of alleged misconduct. CCCF processes grievances in accordance with the ODOC Administrative Rules governing the Grievance Review System (revised March 1, 2011). The Inmate Orientation Packet, given to inmates when they first arrive at the facility, contains instructions for filing grievances. The inmate handbook also contains this information, and inmates can ask any

[1] Hoefel was the Health Services Administrator at the ODOC; Dr. Shelton was the Medical Director at CCCF; Steward was the CCCF Superintendent; Villanueva was the Administrator of Medical Services; and Robertson was the Human Resources Manager.

housing unit officer for a grievance form. An inmate may appeal any grievance response. Lewis filed grievance forms about other unrelated incidents on May 21, 2013, October 16, 2013, and October 30, 2013. Lewis never filed a formal grievance form related to the incident with Dr. Snider. She asserts that her informal complaint, along with Bepple's informal complaint, led to the investigation by SIU. Bepple, however, used the formal grievance procedure at CCCF to report Dr. Snider.

Bepple also filed a tort claim notice on October 3, 2013. Lewis filled out a tort claim notice, dated October 27, 2013, regarding the incident with Dr. Snider. The Department of Administrative Services acknowledged receipt of Lewis's notice in a formal letter dated October 30, 2013. On November 12, 2013, the Department of Administrative Services completed a Notice of Denial for Lewis's claim.

Bepple and Lewis allege that Dr. Snider acted for his own sexual gratification rather than any medical reason. According to Bepple and Lewis, Defendants unlawfully failed to require visible attendants during gynecological exams, report Dr. Snider's conduct to an outside agency, and hire, train, and supervise medical staff in how to properly treat female inmates to prevent sexual assault. Bepple and Lewis, seeking to represent a putative class of other female inmates treated by Dr. Snider, filed this lawsuit on April 29, 2015.

## DISCUSSION

### A. Class Certification

Defendants argue that Plaintiffs failed to follow the proper procedure for class certification and that the Court should thus refrain from certifying the putative class. Plaintiffs have not yet moved for class certification, and Defendants cite no authority allowing an attack on the suitability of class certification through a motion for summary judgment. Meaningful differences exist between motions for summary judgment and motions to certify a class. A court

ruling on a motion for summary judgment considers the factual and legal merits of a party's claims. *See* Fed. R. Civ. P. 56. In contrast, a motion to certify a class calls on a court to make "a procedural ruling, collateral to the merits of a litigation." *Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 336 (1980).

Additionally, the standard of review applied to orders granting or denying motions for summary judgment differs from standards governing a district court's decision on class certification. Although the Ninth Circuit reviews *de novo* rulings on summary judgment, *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011), the Ninth Circuit reviews class-certification decisions for an abuse of discretion, *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 946 (9th Cir. 2011). Further, the rules governing interlocutory appealability differ among orders granting or denying motions for summary judgment and orders granting or denying motions for class certification. *Compare* 28 U.S.C. § 1292 (interlocutory decisions), *with* Fed. R. Civ. P. 23(f) (class actions).

The differences between motions for summary judgment and motions for class certification do not suggest that a court must always consider such motions in a particular order. The Ninth Circuit has recognized that "in some cases, it may be appropriate in the interest of judicial economy to resolve a motion for summary judgment or motion to dismiss prior to ruling on class certification."*Wade v. Kirkland*, 118 F.3d 667, 670 (9th Cir. 1997). Here, the costs of further discovery on meritless claims and the amount of briefing done by the parties weigh in favor of the Court considering Defendants' motion at this time.[2] The Court does not, however,

[2] Defendants also raise a mootness argument because Bepple is no longer incarcerated at CCCF. This argument may affect the Court's analysis concerning the appropriateness of class certification and whether Bepple is individually entitled to injunctive relief. It does not, however, affect Bepple's claim for money damages. Thus, the Court defers addressing Defendants' mootness arguments as premature.

consider any arguments concerning whether Plaintiffs may use the procedural device of a class action to bring their claims. The parties may make those arguments if and when Plaintiffs seek class certification.

**B. Lewis's Claims**

**1. Failure to Exhaust Administrative Remedies**

Defendants argue that the Court should dismiss all Lewis's federal claims because she failed to exhaust her available administrative remedies as required by the Prison Litigation Reform Act (PLRA). Lewis does not assert that she followed the required grievance procedures. She argues only that her informal complaints with Bepple, who did follow the required grievance procedures, sufficed and that any other grievance procedures were futile after Ufford's investigation found no wrongdoing by Dr. Snider.

The PLRA provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has stressed that the PLRA requires "proper exhaustion" so that the state grievance system receives "a fair opportunity to consider the grievance." *Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006). Such a fair opportunity does not exist "unless the grievant complies with the system's critical procedural rules." *Id.* at 94. Congress intended 42 U.S.C. § 1997e(a) "to reduce the quantity and improve the quality of prisoner suits . . . . In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). Additionally, "the internal review might 'filter out some frivolous claims'" and, for those claims brought to court, create "an administrative record that

clarifies the contours of the controversy." *Id.* at 525 (quoting *Booth v. Churner*, 532 U.S. 731, 737 (2001)).

"Nonexhaustion" is "an affirmative defense" and defendants have the burden of "prov[ing] that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014). A remedy is "available" where it is "capable of use; at hand." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1171) (quotation marks omitted). Grievance procedures that do not allow for all types of relief sought are still "available" as long as the procedures may afford "some relief." *Booth v. Churner*, 532 U.S. 731, 738 (2001). If a defendant meets the initial burden, a plaintiff then must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. Remedies are "effectively unavailable" where they are "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Id.* (quoting *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)). "[T]he ultimate burden of proof," however, never leaves the defendant. *Id.*

Here, the ODOC rules "encourage inmates to address their concerns informally with appropriate staff and managers through either dialog or by utilizing inmate communication forms." Or. Admin. R. ("OAR") 291-109-0100 (2013). With respect to incidents of sexual contact between staff and an inmate, the rules specify that an inmate should immediately report the incident to a trusted staff member, the Inspector General's hotline number, or both. OAR § 291-109-0125(1) (2013). Inmates with concerns about such contact may also use the inmate grievance review system, which provides two levels of appeal. OAR § 291-109-0125(2) (2013). An inmate initiates the grievance process by filing a written grievance on the approved

inmate grievance form. The form must include a complete description of the events. OAR § 291-109-0140 (2013). Inmates must submit the grievance form to the functional unit grievance coordinator within 30 days of the incident giving rise to the grievance. Inmates may appeal any grievance response to the functional unit manager within 14 days from the date the inmate receives the grievance response, and the functional unit manager must respond to the inmate's grievance appeal within 30 days. Inmates may then appeal to the Assistant Director, who must respond to the inmate's grievance appeal within 30 days. The rules do not specify the type of relief that may be granted. *See* OAR § 291-109-0170 (2013).

Despite using the process three separate times in unrelated matters, Lewis did not use ODOC's grievance procedures to report Dr. Snider's conduct. Bepple, in contrast to Lewis, used the grievance procedure to report Dr. Snider's alleged treatment of her. Lewis does not argue that prison staff led her to believe a grievance form was unnecessary or would not be considered in her case. According to Lewis, it was only the result of Ufford's "sham investigation" that caused her to believe the grievance procedure would be ineffective. Dkt. 22 at 2. Although Lewis reported Dr. Snider's conduct to Bruns and gave information to Ufford, Lewis could not have become aware of any results of Ufford's investigation until at least the close of the investigation on June 12, 2013. The investigation closed after the 30-day period that Lewis had to file her grievance form, meaning that the results could not have influenced her decision to refrain from using the grievance procedures in a timely manner. Nor did the ODOC rules specify that the grievance procedures could afford no additional relief during an open investigation.

These facts distinguish Lewis's case from the situation in *Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2005). There, the Ninth Circuit found no "available" procedures because the prison's rules explained "that staff misconduct grievances are to be investigated *only* through the staff

complaint process, thereby negating any possibility of a parallel investigation through the appeal process." *Id.* at 938-39 (emphasis added). Unlike in *Brown*, here, there was a possibility that CCCF would investigate Lewis's complaints separately through the appeal process had she filed a grievance. Accordingly, Lewis failed to exhaust the administrative remedies available to her, precluding her federal claims.

**2. Notice of Tort Claim under the Oregon Tort Claims Act ("OTCA")**

Defendants argue that Lewis is barred from bringing her state tort claims because she failed to file a timely notice of a tort claim as required by the OTCA. The OTCA requires a plaintiff to provide notice of a claim within 180 days of the alleged injury. Or. Rev. Stat. ("ORS") § 30.275(2)(b). Defendants assert that the Department of Administrative Services received Lewis's notice on October 29, 2013, 181 days after the alleged injury. In support of their assertion, Defendants point to a blank piece of paper with the date October 29, 2013 stamped on it. Dkt. 21 at 19.

Lewis responds that she dated her notice October 27, 2013, and that the Department of Administrative Services received the notice before October 29, 2013. Lewis also emphasizes that the Department sent her an acknowledgement of receipt on October 30, 2013, without suggesting that the notice was untimely. The Department also reviewed her claim on the merits rather than finding her notice untimely. In support of her assertions, Lewis submits a copy of her tort claim notice, dated October 27, 2013. Dkt. 23-1 at 1. Drawing all reasonable inferences in favor of Lewis, the non-moving party, the Court finds—for purposes of summary judgment—that Lewis timely submitted a tort claim notice to the Department of Administrative Services by

October 28, 2013, which is within the 180-day notice period required under the OTCA. Accordingly, Lewis's state law claims may proceed to trial.[3]

**C. Bepple's Claims**

As an initial matter, Plaintiffs concede that the individual defendants are only liable in their personal capacities. The Court therefore grants summary judgment on Bepple's federal claims against individual defendants in their official capacities. *See generally Worcester Cnty. Trust Co. v. Riley*, 302 U.S. 292, 296 (1937) ("Petitioner does not deny that a suit nominally against individuals, but restraining or otherwise affecting their action as state officers, may be in substance a suit against the state, which the Constitution forbids . . . .").

**1. § 1985 Claims**

Bepple asserts two claims under 42 U.S.C. § 1985 ("§ 1985"), which prohibits conspiracies to interfere with certain civil rights. Section 1985 prohibits five categories of conspiracy. Three of the five categories of conspiracy relate to interference with the institutions

[3] The OTCA provides the "sole cause of action for any tort committed by officers, employees or agents of a public body acting within the scope of their employment or duties and eligible for representation and indemnification" by the public body. ORS § 30.265(2). The OTCA bars actions against individual tortfeasors acting within the scope of their public employment and provides that the court upon motion will substitute the public body as the sole defendant. ORS § 30.265(3). The OTCA provides only two exceptions to the prohibition on tort claims against individual public employees acting within the scope of their duties: (1) when the employee is not subject to indemnification because the employee is sued for acts that amount to "malfeasance in office or willful or wanton neglect of duty," ORS § 30.285(2); and (2) when the OTCA action alleges damages greater than the OTCA's statutory damage cap, which is $1.8 million for a single claimant and $3.6 million for all claimants bringing a cause of action arising on or after July 1, 2012, and before July 1, 2013, ORS §§ 30.271(2)-(3). Defendants have not moved to substitute the State of Oregon for the individual defendants, and therefore, the Court does not consider at this time whether the individual defendants acted within the scope of their employment or duties or would be eligible for representation and indemnification. *See Berry v. State, Dep't of Gen. Servs.*, 141 Or. App. 225, 230 (1996) ("Before the court can grant [a motion to substitute the public body], however, it must be satisfied that the employee acted in the scope of state employment and, thus, that the plaintiff has no claim against the employee as an individual.").

and processes of the federal government: interfering with federal officers, § 1985(1); interfering with federal judicial proceedings, the first clause of § 1985(2); and interfering with federal elections, the second clause of § 1985(3). *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The other two categories primarily relate to interference with the institutions and processes of state government: conspiracies to obstruct the course of justice in state courts, the second clause of § 1985(2); and conspiracies to prevent state authorities from securing a person's equal protection of the laws, the first clause of § 1985(3). *Id.* at 725. Only the latter two categories "require[e] that the conspirators' actions be motivated by an intent to deprive their victims of the equal protection of the laws." *Id.*

**a. § 1985(2)**

The first clause of § 1985(2)—which does not require class-based animus—defines the unlawful act of "obstructing justice" or "intimidating" a party, witness, or juror:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror . . . .

Bepple does not present evidence that any of the defendants conspired to deter anyone from attending or testifying in federal court. Nor does Bepple present evidence that any of the defendants conspired to injure any party or witness on account of that person attending or testifying in federal court. Nor does Bepple present evidence that any of the defendants conspired to influence a grand jury or juror in any way. The Court thus construes Bepple's § 1985(2) claim as a claim under the second clause of the statute.

The second clause of § 1985(2) further defines the unlawful act of "obstructing justice" or "intimidating" a party, witness, or juror:

> [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws . . . .

The Ninth Circuit has emphasized that the phrase "equal protection" used in the second part of § 1985(2) "require[s] an allegation of class-based animus for the statement of a claim under that clause." *Bretz v. Kelman*, 773 F.2d 1026, 1030 (9th Cir. 1985); *see also Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 763 (9th Cir. 1991) (stating that the second part of § 1985(2) requires "a class-based, invidiously discriminatory animus") (quoting *Phillips v. Bridgeworkers Local 118*, 556 F.2d 939, 940-41 (9th Cir. 1977) (quotation marks omitted)).

Bepple alleges that because of her gender, Defendants conspired to obstruct or defeat any prosecution of Dr. Snider with the intent to deprive Bepple of her First Amendment right to redress grievances against the government and her Eighth Amendment right to be free from cruel and unusual punishment. Invidious class-based animus "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271-72 (1993) (quoting *Pers. Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)) (alteration in original). The "invidious" requirement calls for a showing that discrimination was of the sort "[t]ending to excite odium, ill will, or envy; likely to give offense; esp., unjustly and irritatingly discriminating." *Id.* at 274 (quoting *Webster's Second International Dictionary* 1306 (1954)) (quotation marks omitted).

Bepple's only evidence that Defendants acted with class-based animus is the fact that CCCF did not require male inmates to undergo mandatory urological examinations. This evidence, however, is insufficient to create a genuine dispute of material fact that Defendants covered up Dr. Snider's alleged conduct because of Bepple's gender. Although it is true that only women would be subject to any sexually inappropriate gynecological examinations, a disparate effect on women does not, in itself, suffice to show invidious class-based animus. *See Id.* at 271 (rejecting the argument "that since voluntary abortion is an activity engaged in only by women, to disfavor it is *ipso facto* to discriminate invidiously against women as a class") (footnote omitted); *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974) ("While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . ."). Bepple's evidence does not show invidious class-based animus.

**b. § 1985(3)**

The first clause of § 1985(3) is the only part that could relate to Bepple's claims as the second part pertains only to conspiracies to prevent someone from exercising voting rights. The first part of the statute defines the unlawful act of "depriving persons of rights or privileges" as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . .

To prove a claim under this provision, a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of

> the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

Like § 1985(2), the first clause of § 1985(3) requires "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). For the reasons already discussed, Bepple has not presented evidence of invidious class-based animus. The Court therefore grants Defendants' motion for summary judgment on Bepple's § 1985 claims.

**c. Qualified Immunity**

Defendants Dr. Shelton, Dr. Sazie, Steward, Shimabuku, Brown, Bruns, Hetlage, Hoefel, Villanueva, Ufford, Coulter, Robertson, and Vu argue that they are entitled to qualified immunity for any potential violation of Bepple's rights under § 1985. A plaintiff may not recover money damages from an individual state official unless a plaintiff shows "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Because the Court finds no statutory or constitutional deprivation under § 1985, the Court need not further address Defendants' qualified immunity argument.

**2. Personal Participation in the Alleged Constitutional Deprivations**

Defendants argue that Bepple fails to present evidence that Dr. Shelton, Dr. Sazie, Ufford, Shimabuku, Steward, Villanueva, Brown, Robertson, Hetlage, Hoefel, Bruns, Coulter,

and Vu personally participated in the alleged constitutional deprivations. Bepple does not assert that Ufford, Shimabuku, Steward, Villanueva, Brown, Robertson, Hetlage, Hoefel, Bruns, Coulter, or Vu participated in any other constitutional deprivation other than the alleged § 1985 violations. Because the Court grants Defendants' motion for summary judgment on Bepple's § 1985 claims, the Court does not further discuss any allegations other than those against Dr. Shelton and Dr. Sazie.[4]

In a § 1983 suit, "vicarious liability is inapplicable," and therefore, a plaintiff must establish "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). A supervisor may be liable under § 1983 "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)) (quotation marks omitted). There must, however, be "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* at 1207 (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)) (quotation marks omitted).

Here, Bepple presents evidence that Ufford conducted an investigation into Plaintiffs' complaints that Dr. Snider had touched Plaintiffs inappropriately. Ufford's report contained

[4] Plaintiffs' complaint alleges only that Dr. Shelton, Dr. Sazie, and Dr. Snider violated Plaintiffs' Eighth Amendment rights. Dkt. 1 ¶ 39. In Plaintiffs' response to Defendants' motion, Plaintiffs state: "Defendants Shelton, Sazie, Ufford, Shimabuku, Steward, Villanueva, Brown, Robertson, Hetlage, Hoefel, Bruns, Coulter, and Vu are [i]ndeed liable under § 1983." Dkt. 22 at 3. Plaintiffs do not, however, ask for leave to amend their complaint to add § 1983 claims against the other defendants, and plaintiffs may not assert a new claim in their response to a defendant's motion for summary judgment. *See Wasco Prods. Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("'[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (quoting *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 24 (1st Cir. 1990)).

descriptions of Dr. Snider's alleged conduct and Coulter's statement that Bepple "looked maybe a little uncomfortable." Dkt. 21 at 11. The report also noted that Coulter "was behind a curtain and could hear both the doctor and patient talking. *Id.* at 8. Coulter never told Ufford that Coulter could see Bepple during the entire exam. The report further noted that Vu "could hear the doctor and patient talking but she did not watch the entire process as it was being conducted." *Id.* at 7. Robertson in Human Resources received a copy of the report, which established that attendants had not visually supervised Dr. Snider. Robertson then sent the report to Dr. Shelton, Steward, Villanueva, Brown, and Hoefel. There is no evidence that, after receiving the report, Dr. Shelton, as the State Medical Director, took any action to limit Dr. Snider's contact with patients, investigate the complaints, alert outside authorities, or ensure that attendants visually supervised gynecological examinations. There is no evidence that, after Ufford's investigation, Dr. Shelton took any remedial measures to address Dr. Snider's alleged misconduct.[5]

Bepple has presented sufficient evidence to create a genuine dispute of material fact regarding whether supervisor Dr. Shelton failed to train, supervise, or control Dr. Snider, acquiesced in Dr. Snider's improper treatment of patients, or showed a reckless or callous indifference to the rights of female inmates required to receive gynecological exams. Bepple also has presented sufficient evidence, construed in the light most favorable to Bepple, that such failures directly caused her alleged harm. In contrast, Bepple has not presented any evidence that

[5] In Plaintiffs' response to Defendants' motion, Plaintiffs state: "What [all named defendants] knew or did not know, or did or did not do, are subject to discovery and depositions, however, at minimum, they were copied with the SIU allegations, report and denial of liability and took no steps to challenge the suspect findings." Pursuant to Fed. R. Civ. P. 56(d), the Court deferred ruling on Defendants' first motion for partial summary judgment (Dkt. 7) as requested by Plaintiffs. The Court ordered Defendants to provide discovery to Plaintiffs, and Plaintiffs had two months in which to conduct any necessary depositions. Before responding to Defendants' amended motion for summary judgment (Dkt. 19), Plaintiffs did not request that the Court grant any additional time for discovery. Accordingly, the Court considers Defendants' motion for summary judgment on the current record.

Dr. Sazie, whom Bepple alleges was the Medical Director for CCCF, ever knew of the investigation into Dr. Snider's conduct or in any way contributed to Bepple's injury. Summary judgment is granted as to the claims against Dr. Sazie.

## CONCLUSION

Defendants' Amended Motion for Partial Summary Judgment (Dkt. 19) is GRANTED IN PART and DENIED IN PART. The motion is granted as to all claims against Defendants in their official capacities, all of Plaintiff Lewis's federal claims, Plaintiff Bepple's claims under 42 U.S.C. § 1985, and Plaintiff Bepple's claim under 42 U.S.C. § 1983 against Defendant Dr. Sazie. Defendants' motion is denied as to Plaintiff Lewis's state tort claims of medical negligence and sexual battery and Plaintiff Bepple's claim under 42 U.S.C. § 1983 against Defendant Dr. Shelton. Therefore, remaining for trial are (1) Plaintiffs' state tort claims for medical negligence against Defendants Dr. Snider, Dr. Shelton, Dr. Sazie, Coulter, and Vu; (2) Plaintiffs' state tort claims for sexual battery against Dr. Snider; and (3) Plaintiff Bepple's claims under 42 U.S.C. § 1983 against Defendants Dr. Snider and Dr. Shelton.

**IT IS SO ORDERED**.

DATED this 17th day of February, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge